# STATE EX REL. EQUITY FARMS, INC. v. C. M. HUBBARD AND ANOTHER.[1]

June 10, 1938.

No. 31,698.

[1]Reported in 280 N. W. 9.

*A. C. Richardson,* County Attorney, for appellants (respondents below).

*Nelson & Plunkett,* for respondent (relator below).

*William S. Ervin,* Attorney General, *Matthias N. Orfield,* Deputy Attorney General, and *William D. Gunn,* Special Assistant Attorney General, *amici curiae,* filed a brief in support of the constitutionality of Ex. Sess. L. 1937, c. 88, and there was an oral argument by *William D. Gunn,* Special Assistant Attorney General.

JULIUS J. OLSON, JUSTICE.

Proceeding in *mandamus* on the relation of the owner of certain farm lands in Mower county against the county auditor and treasurer of that county to compel acceptance of $1,055.10, being three-fifths of the amount of delinquent taxes theretofore levied and assessed upon the involved premises, which had been forfeited to the state for their nonpayment, pursuant to and in conformity with the provisions of Ex. Sess. L. 1937, c. 88. The facts were stipulated, and the court found them to be true and by its order directed

the issuance of the petitioned writ. The mentioned county officers moved for amended findings or new trial. This being denied, they have appealed. Hereafter we shall refer to the landowner as plaintiff and the county officers as defendants.

The only issue presented by the appeal is the constitutionality of the act under which the writ is sought. Defendants' only defense is that the mentioned act is unconstitutional upon the following grounds: (1) That it is special and class legislation; (2) that it violates the equality provision of the state and federal constitutions; and (3) that it imposes taxes for private, not public, purposes.

We have been greatly helped in the consideration and decision of this case by an able brief submitted by the attorney general in support of the constitutionality of the act. In his brief he carefully reviews the history and purpose of the attacked law. A brief résumé of the reasons advanced by him is essential to a thorough understanding of the problem presented.

The involved enactment was obviously intended to supplement L. 1933, c. 407, 3 Mason Minn. St. 1936 Supp. §§ 2176-3 to 2176-8. That enactment permitted the owner of land forfeited to the state for nonpayment of taxes for the years 1926 or 1927, or both, to repurchase such land from the state upon payment, within one year from the date of the forfeiture, of one-half of the taxes accrued against the property at date of forfeiture. This enactment was before this court for consideration in State ex rel. Beeth v. Monick, 201 Minn. 635, 277 N. W. 211. It is true that the constitutionality of that act was not there attacked, the parties thereto having proceeded upon the theory of its validity.

The purpose of the legislation in the mentioned law and others of similar import was obviously to furnish a speedy and effective means by which forfeited lands might return to the tax rolls. That this is a lawful and proper purpose of legislative enactment has long been settled. State ex rel. Kipp v. Johnson, 83 Minn. 496, 86 N. W. 610; State ex rel. Coates v. Butler, 89 Minn. 220, 94 N. W. 688.

Under L. 1935, c. 386, § 7, as amended by Ex. Sess. L. 1935, c. 105, § 2, 3 Mason Minn. St. 1936 Supp. § 2139-21, it was provided that

upon forfeiture of real estate to the state for unpaid taxes the county auditor was required to cancel all taxes and tax liens appearing upon his records, both delinquent and current. And this included special assessments whether delinquent or otherwise. Thus it will be seen that while such property was held by the state it could not be subjected to taxation of any type, thereby depriving not only the state but likewise the localities in which the properties might be situated from sharing the tax burdens common to ownership. Under the law here involved provision is made for the reinstatement of special assessments payable in 1937 and thereafter, theretofore cancelled by virtue of the mentioned act. Upon repurchase, lands become subject to assessment and collection of taxes in the same manner as other lands. Necessarily, then, the object sought by the present act is to help all property owners by an equivalent diminution of the burdens of taxable property. Thus it is clear, so it is said, that this produces a substantial benefit not only to the former owner who has again entered the ranks of a taxpayer, but also helps to a *pro rata* extent every other taxpayer because of his reëntry in that role.

The attorney general informs us that on May 11, 1938, the records of the tax commission showed that 2,412 deeds had been issued by the state pursuant to the provisions of this chapter; and he further directs our attention to the fact that in Ramsey county alone, at a subsequent date to the one reported by the tax commission, 1,561 parcels were repurchased by the former owners in conformity with the provisions of this chapter. The total taxes and assessments involved in connection with the Ramsey county lands alone amounted to $448,324.11, and the assessed value of the same parcels was only $363,667. These are matters of public interest and concern, disclosed by public records, and as such we may properly take judicial notice of them. Of course, it is not for us to inquire into the wisdom and propriety of the mentioned enactment. Our only inquiry is whether the act, in view of its history and background, is such that we must determine its invalidity on constitutional grounds.

■ Defendants place much reliance upon State ex rel. Matteson v. Luecke, 194 Minn. 246, 260 N. W. 206, 99 A. L. R. 1053. When the

enactment here involved was adopted the legislature had before it the information to be gathered from that decision and, in addition, the experience of several later legislative enactments, all having to do with the problem of real estate tax delinquency. That the legislature was fully advised and informed respecting the true situation cannot be doubted; and that remedial measures were highly important and probably imperative seems equally clear.

"The proprietary rights of a state are as absolute and unqualified as those of an individual. It may, in the absence of any self-imposed restrictions in its constitution, sell and dispose of its property upon its own terms and conditions, for cash or upon credit; and it may also take, hold and enforce notes and obligations received from the purchasers of its property, the same as individuals can." 6 Dunnell, Minn. Dig. (2 ed.) § 8829, and cases cited under notes; State ex rel. Matteson v. Luecke, *supra.*

The last mentioned case had to do with whether the legislature could pass an act favoring a taxpayer who was slow and delinquent by permitting him to pay his tax burdens at a discount as compared with those who paid their taxes promptly. It was for that reason alone that the enactments there involved were held to be unconstitutional. The opinion recognizes the right of the state to dispose of its property in any fashion it may see fit. Nor is that case out of line with other cases such as State ex rel. Remer v. Erskine, 178 Minn. 404, 227 N. W. 209, where the validity of L. 1929, c. 117, 3 Mason Minn. St. 1936 Supp. § 2104-1, permitting the payment of delinquent taxes for certain years without the payment of penalty and interest was sustained. There, as here, the law was attacked because it favored the slow or delinquent taxpayer at the expense of him who pays promptly and in full. This court in passing upon that phase had this to say (178 Minn. 407, 227 N. W. 210) :

"To some extent those who pay promptly will gain by the putting of the delinquent tax lands on a paying basis. The injustice to them may not be so great as is imagined. But in any event it was

the purpose of the legislature to get payment of the 1926, 1927 and 1928 taxes, and how they should effect the result was a matter for them. And there was a sufficient reason why the favor should be extended, since it came from the state, only when there were taxes delinquent at the time of the enactment of the statute and held by the state."

And the same situation existed when c. 88 was enacted; then, too, as in the Erskine case, "there were taxes delinquent at the time of the enactment of the statute and held by the state." As to these, the obvious purpose of the legislature was to devise a speedy and effective means by which lands so forfeited to the state might be placed back upon the tax rolls. That such purpose and the means here devised to bring about that result is a proper one for legislative action cannot be doubted.

"The legislature has the power to provide that the state may sacrifice one-half of the taxes in order to get the lands back upon the tax books for the purpose of producing revenue * * *" State ex rel. Kipp v. Johnson, 83 Minn. 496, 497, 86 N. W. 610; State ex rel. Coates v. Butler, 89 Minn. 220, 94 N. W. 688.

Of course, it is not the policy of the state, nor should it be, to deprive owners of real estate of their interest therein on account of tax delinquency. If any reasonable means can be devised whereby ownership may be protected against tax forfeitures, without injury to others, clearly it should be the purpose of the state to lend a helping hand. In the language of 4 Cooley, Taxation (4 ed.) § 1558, pp. 3064, 3065:

"It is not the policy of the law that any man should forfeit his estate because from inability, or even from negligence, he has failed to meet his engagements or to perform his duties by some exact day which has been prescribed by statute. On the contrary, it is for the welfare of every community that the law should favor the citizen in all reasonable measures for the preservation of his estate against losses which might result from his misfortunes or his faults, ex-

tending to him all the liberality that is consistent with justice to others and to a proper regard for the interest of the public."

■ Is the legislative act here involved unconstitutional as class legislation? 1 Dunnell, Minn. Dig. (2 ed. & Supps.) § 1668, defines the subject as follows:

"Class legislation is such as selects particular individuals from a class, and imposes upon them special burdens, from which others from the same class are exempt, and thus denies them the equal protection of the laws."

See cases cited under note 28. The general principles applicable to such legislation are well stated by the same author in the following section (§ 1669):

"Class legislation, discriminating against some and favoring others, is prohibited, but legislation is not prohibited either by the state or federal constitution, which, in carrying out a public purpose, is limited in its application, if, within the sphere of its operation, it affects alike all persons similarly situated and the classification is not arbitrary. Whether a law shall apply generally throughout the state or only to a class or locality, is a question of legislative policy for the determination of the legislature. When the legislature has determined that a sufficient distinction exists between two classes of persons to justify applying rules to one class which do not apply to the other, such determination is binding upon the courts, unless they can point out that the distinction is purely fanciful and arbitrary, and that no substantial or logical basis exists therefor. The grounds for a discrimination between persons similarly situated may be slight. The question is primarily for the legislature and unless a discrimination is manifestly arbitrary and unreasonable it will be sustained. Courts are now less strict than formerly in applying the constitutional prohibition of class legislation. Legislation making certain acts criminal is not class legislation merely because it affects a class of people who are prone to commit the forbidden acts." (See also cases cited under notes.)

■ Any classification is permissible which has a reasonable relation to some permitted end of governmental action. Reed v. Bjornson, 191 Minn. 254, 265, 253 N. W. 102; Watson v. State Comptroller, 254 U. S. 122, 41 S. Ct. 43, 65 L. ed. 170. Here, too, as in the Erskine case, we can see no constitutional objection to the classification made. We must bear in mind that the taxes for which this land was forfeited to the state had gone to judgment year by year. The lands had been offered for public sale in conformity with applicable statutes. There being no bidder the only thing that could be done was for the state to bid in the property at these sales in its own name. By virtue of then existing enactments the landowner's title was gone. His rights were "forfeited" to the state. To bring about his reëntry into the taxpaying roll was certainly an appropriate legislative function. Experience has demonstrated, as we have heretofore pointed out, the wisdom and efficiency of the enactment. As was said in Reed v. Bjornson, 191 Minn. 258, 253 N. W. 104:

"The present art. 9, § 1, requiring taxes to be 'uniform on the same class of subjects,' was adopted under circumstances which conclusively show that it was the purpose of the people to relieve the legislature of the rather narrow restrictions theretofore placed upon that branch of the government by the constitution and to enlarge its powers in regard to taxation."

■ Defendants' claim that the act amounts to an imposition of taxes for private, not public, purposes is not persuasive. Obviously the state's interest in this property is now, by reason of forfeiture, that of an owner. The taxes went to judgment and sale, the state becoming the owner. As such, and we need not repeat what has been said, it has a proprietary interest. It may sell and dispose of this as it sees fit the same as an individual. We find no constitutional prohibition against the state so doing. The mere fact that Mower county is less burdened than most other counties in the state is its good fortune not the fault of other localities. Necessarily the legislature had to act for the state as a whole. We therefore conclude that upon the facts here set forth the involved act is

not constitutionally vulnerable as against defendants' attack that: (1) It is special or class legislation; (2) in violation of the equality provision of our constitution or the equal protection clause of the federal constitution; or (3) as imposing taxes for private purposes.

While there are other arguments made in briefs of counsel, we think what has been said is sufficient to dispose of the appeal on its merits.

The order is affirmed.

